UNITED STATES, Appellee

v.

Gregory L. MONROE, Sergeant
U.S. Army, Appellant.

No. 94–0673.
CMR No. 9201740.

U.S. Court of Appeals for
the Armed Forces.

Argued March 8, 1995.

Decided Sept. 14, 1995.

For Appellant: *Captain Blair M. Jacobs*
(argued); *Colonel Stephen D. Smith, Lieutenant Colonel John T. Rucker, Captain Roy H. Hewitt* (on brief); *Major Robin L. Hall.*

For Appellee: *Captain Anthony P. Nicastro* (argued); *Colonel John M. Smith* and *Lieutenant Colonel James L. Pohl* (on brief); *Captain Jane F. Polcen.*

*Opinion of the Court*

CRAWFORD, Judge:

1. On May 28 and July 15 and 28, 1992, appellant was tried by a general court-martial composed of officer and enlisted members at Fort Knox, Kentucky. Pursuant to his pleas, he was convicted of wrongful use of crack cocaine (2 specifications). Contrary to his pleas, he was also convicted of wrongful distribution of crack cocaine (2 specifications). All these offenses were violations of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The convening authority approved the sentence of a dishonorable discharge, 6 years' confinement, and reduction to Private E1. The Court of Military Review [1] affirmed the findings and sentence without opinion.

2. We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRONEOUSLY DEPRIVED APPELLANT OF THE RIGHT TO A FAIR TRIAL BY FAILING TO ABATE THE PROCEEDINGS WHERE A MATERIAL

---

1. *See* 41 MJ 213, 229 n. * (1994).

WITNESS WITH EXCULPATORY EVIDENCE WAS NOT GRANTED TESTIMONIAL IMMUNITY BY THE CONVENING AUTHORITY.

We hold that the judge did not abuse his discretion by declining to abate the proceedings following the decision by the convening authority to deny a grant of testimonial immunity to the witness in question.

## STATEMENT OF FACTS

3. Appellant initially pleaded guilty to the two specifications of wrongful distribution of crack cocaine, but the judge did not accept the pleas when a potential defense of entrapment was raised during the providence inquiry.

4. At trial on the merits, the defense attempted to establish appellant's lack of predisposition to distribute crack cocaine via evidence surrounding the Government's attempts to induce appellant's participation in a sale of drugs. To facilitate an entrapment defense, appellant wished to present the testimony of Private B, a registered source working with the Criminal Investigation Command (CID). After being called to testify at a session under Article 39(a), UCMJ, 10 USC § 839(a), B stated that he was likely to invoke his Fifth Amendment right not to incriminate himself if asked to testify at trial. The judge instructed counsel to attempt to gain use immunity for the witness from the convening authority.

5. B testified at the Article 39(a) session to this effect as to his knowledge of the events: (1) He was in the same unit as appellant and had known him approximately one year. (2) He was arrested by CID and court-martialed; after his arrest, he started working with CID. (3) The CID wanted to "target" appellant for "distribution, possession, or something" because he had recently tested positive for use of cocaine. (4) B first approached appellant in December 1991. (5) He approached appellant approximately ten times prior to the first "deal" on January 6, 1992. (6) Appellant refused each time he was asked to go to "E-town" [a known crack sale area] until January 6 when appellant went with him. (7) Immediately after January 6, the CID wanted to set up another "deal." Appellant was asked a few times to go along but again refused. (8) He had never seen appellant distribute drugs to anybody or had heard of him distributing drugs to anybody prior to January 6.

6. It is important to compare B's testimony with the trial testimony of former CID agent Mark J. Clay and CID Special Agent Ballman, who was in charge of appellant's investigation.

7. Clay testified that he was introduced to appellant by "a registered source" (B) but did not state his name at trial. All three went to Elizabethtown to buy crack cocaine. Appellant directed B where to go to buy drugs and agreed to Clay's request that appellant control the purchase. When they reached the location to which appellant had directed them, appellant told a black male that he wanted $40.00 worth of drugs for himself and $200.00 worth for a friend. The seller said that he did not have enough for that, so appellant would have to drive around and then return. When they returned and found the seller, he had 10 packages of crack cocaine for $30.00 each. Appellant asked to see the cocaine and then told the seller that he was asking too much. As a result the charge for each bag was reduced to $20.00.

8. After returning to Fort Knox, Clay gave appellant his pager number and told him to "call me any time he's willing . . . to purchase any more crack cocaine or even if he needs a ride down there." A few hours later Clay was paged on his beeper by appellant. He returned the call, and appellant asked if Clay had any crack cocaine left because appellant needed additional cocaine to distribute to his friends. Clay tried to put him off, but appellant called back within an hour. At that time Clay told appellant that he had sold all the cocaine. About 3 weeks later Clay contacted appellant and told him that he wanted to purchase some more crack cocaine. Appellant asked Clay to come to his house. When he arrived, appellant asked for "some crack cocaine for his services." Clay agreed. While driving to Elizabethtown, appellant said he thought that B was "burnt"

and "may be working with CID" and was not a person "to be trusted."

9. When they approached the seller, a black male whom appellant had seen earlier in the day got into the car with appellant, and Clay and appellant asked him for $500.00 worth of crack cocaine. The seller responded that he had some cocaine, some $20.00 bags and $40.00 bags. Appellant then asked how much the seller charged for seven rocks. The seller said he would charge $250.00. Appellant agreed and the exchange went down. Appellant then asked "if he had any more" cocaine. The seller responded that he still had some $20.00 rocks. Whereupon appellant gave him $200.00 for ten $20.00 rocks of cocaine. On the way back to Fort Knox, appellant "took one of the smaller pieces of crack cocaine and tasted it"; then he remarked "that it didn't taste too bad." He then put some of the smaller pieces of crack cocaine into a small plastic bag. Thereafter appellant told Clay that he had friends in Ohio and in Atlanta to whom he would like to sell some cocaine and asked Clay if he would participate. Clay said that he would have to check his schedule. Back at Fort Knox, appellant "picked up the plastic bag and retrieved one of the larger pieces of crack cocaine." He invited Clay to come into the quarters. Inside they "counted out approximately seventeen pieces of crack cocaine." For his part appellant received a $40.00 rock and a $20.00 rock.

10. The import of Ballman's testimony was: (1) He first met appellant when appellant was apprehended on January 29, 1992, for possession and distribution of cocaine. (2) After being read his rights, appellant waived those rights and admitted orally that he had gone to Elizabethtown on January 6, 1992, with an undercover CID officer and purchased crack cocaine for himself and for the undercover officer after bargaining for a good price. Appellant admitted a substantially similar arrangement on January 29. (3) Appellant also admitted smoking the crack cocaine in the car in front of B and the undercover officer on both January 6 and 29, 1992. (4) Appellant "negotiated all the drug purchases ... and had the initiative and the know-how in who to deal with down there

and get the illicit drugs." (5) Appellant was reluctant to deal with B because he suspected that B was working with CID.

11. At a later conference under RCM 802, Manual for Courts-Martial, United States, 1984, the parties learned that the convening authority rejected defense counsel's request for a grant of use immunity for B. The military judge announced his findings on the issue:

> I find specifically that as to the 6th of January 1992 specifications, that would be 1 and 3, that his [B's] testimony would not be clearly exculpatory and, in fact, does not go substantially beyond that which you were able to extract from Agent Ballman on cross-examination.
>
> I find specifically, further, that as to the 29th of January, that would be specifications 2 and 4, that his testimony would not be clearly exculpatory; indeed, he was only tangentially involved in that transaction.
>
> Accordingly, your request for other relief [*i.e.*, abatement] from me is denied.

After this ruling, the defense rested and did not present any testimony.

## DISCUSSION

### I

12. At the time of trial, RCM 704(e) provided:

> [I]f a defense request to immunize a witness has been denied, the military judge may, upon motion by the defense, grant appropriate relief directing that ... the proceedings against the accused be abated, upon findings that:
>
> (1) The witness' testimony would be of such *central importance* to the defense case that it is essential to a fair trial; and
>
> (2) The witness intends to invoke the right against self-incrimination to the extent permitted by law if called to testify.

(Emphasis added.) This rule was changed in 1993. *See* Exec. Order No. 12,888, § 1g, 58 Fed.Reg. 69153, 69156.

13. This version of RCM 704(e) was based on *United States v. Villines*, 13 MJ 46 (CMA 1982). RCM 704(e), Drafters' Analysis, Manual, *supra* at A 21–35. Prior to *Villines* there was no Manual provision on this subject. *Villines* was a split decision in which "each judge recognized ... the need to immunize defense witnesses under some circumstances," although "each suggested different possible solutions." Drafters' Analysis, *supra.* Judge Fletcher's lead opinion quoted extensively from the decision of the court below in *Villines* which referenced the fact that there were no cases cited by counsel to support the proposition that the Government is required to give a defense witness immunity. The quoted part of the opinion below went on to say:

> There are opinions on this subject from various United States Circuit Courts of Appeal, however with the majority holding that the Government is not required to grant immunity to a defense witness....

13 MJ at 51 (citations omitted).

14. However, the quoted part of the opinion of the court below acknowledged a then-recent case, *Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir.1980), recognizing the defense right to immunity of a witness "essential to an effective defense." That "Court, however, set out narrow limits for its doctrine, requiring that, among other things, the testimony must be 'clearly exculpatory' and 'essential' and that there must be no 'strong governmental interests' against immunity." The court below concluded that Villines failed to meet this heavy burden. 13 MJ at 51.

15. In an opinion concurring in the result Judge Cook stated that the convening authority's decision not to grant immunity was not reviewable. *Id.* at 56–59. He stressed that this is a function of the Executive Branch and not subject to judicial review. *Id.* at 56–57.

16. Chief Judge Everett, dissenting, concluded that both the convening authority and the military judge are empowered to grant immunity. But a court-martial "may possess some inherent authority to grant immunity in accord with *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)." 13 MJ at 61. Rather than the "clearly exculpatory" language, Chief Judge Everett asked whether the evidence would "be material and clearly exculpatory." *Id.* at 51, 55, 63 n. 8.

17. It is unclear why the drafters' response to *Villines* included the language "central importance." Perhaps they wished to parallel the language found in RCM 703, which concerns, similarly, the production of witnesses and evidence.

18. Next, this Court decided in *United States v. Zayas*, 24 MJ 132 (1987), that the profered testimony of a witness "would have been clearly exculpatory ... because it would have exonerated" the defendant completely if believed. *Id.* at 136. Because Zayas was tried before the effective date of RCM 704(e), this Court in *Zayas* made no distinction between the Manual's "central importance" language and the *Villines–Zayas* "clearly exculpatory" language. *See* discussion in *United States v. Alston*, 33 MJ 370, 374 (CMA 1991).

## II

19. There are three views taken by the Federal courts on defense witness immunity. First, following *Smith*, ¶ 14, that immunity is available under some circumstances.[2] Sec-

2. The idea that a remedy through judicially fashioned immunity absent prosecutorial misconduct as found in *Smith* (¶ 14) exists has been universally rejected. *See, e.g., Earl v. United States*, 361 F.2d 531, 534–35 (D.C.Cir.1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); *United States v. Angiulo*, 897 F.2d 1169 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Turkish*, 623 F.2d 769, 775–77 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *United States v. Tindle*, 808

F.2d 319, 325 n. 4 (4th Cir.1986); *United States v. Thevis*, 665 F.2d 616, 639 (5th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Pennell*, 737 F.2d 521, 527 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *In re Daley*, 549 F.2d 469, 479 (7th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *United States v. Capozzi*, 883 F.2d 608, 614 (8th Cir.1989), *cert. denied*, 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990); *United States v. Paris*, 827 F.2d 395, 399 (9th Cir.1987); *United States v. Hunter*, 672 F.2d

ond, that granting immunity is an Executive function and the Judicial granting of immunity is a violation of the Separation-of-Powers doctrine.[3] Third, that immunity is available when there has been prosecutorial misconduct.[4] Regardless whether we apply the "central importance" test or the "clearly exculpatory" test, we conclude that the judge did not abuse his discretion in not abating the proceedings following the decision of the convening authority to deny testimonial immunity for B.

## III

■ 20. RCM 916(g) recognizes that the defense of entrapment exists when "the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." The key issue is the existence of appellant's predisposition.

21. As we stated in *United States v. Whittle*, 34 MJ 206, 208 (1992):

The defense has the initial burden of going forward to show that a government agent originated the suggestion to commit the crime. Once the defense has come forward, the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the

accused had a predisposition to commit the offense, "prior to first being approached by government agents."

(Citations omitted.)

22. Quoting the Ninth Circuit, we stated in *United States v. Howell*, 36 MJ 354, 358–59 (1993):

Entrapment is designed to prevent the conviction of the "unwary innocent" induced by government action to commit a crime. *It does not, however, protect the "unwary criminal." United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). A defense of entrapment has two elements: government inducement of the crime and the absence of predisposition on the part of the defendant. To be entitled to acquittal as a matter of law on the basis of entrapment, Skarie must point to "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act" by government agents. *United States v. Hart*, 963 F.2d 1278, 1283 (9th Cir.1992) (*quoting United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986)).

(Emphasis added.)

■ 23. B's testimony is neither "clearly exculpatory" nor of "central importance" to appellant's defense of entrapment. There is no dispute over the fact that Blanding was a

---

815, 818 (10th Cir.1982); *United States v. Sawyer*, 799 F.2d 1494, 1506 (11th Cir.1986). Even the Third Circuit has chosen to limit *Smith* to its facts. *See United States v. Santtini*, 963 F.2d 585, 598 n. 6 (3d Cir.1992).

3. *Smith* (¶ 14) violates the separation-of-powers doctrine by permitting a judicially-created immunity. *United States v. Zayas*, 24 MJ 132, 137 (CMA 1987)(Cox, J., dissenting). *See, e.g., United States v. Lugg*, 892 F.2d 101, 104 (D.C.Cir.1989); *United States v. Turkish*, 623 F.2d at 775–79; *United States v. Thevis*, 665 F.2d at 638–41; *United States v. Herrera–Medina*, 853 F.2d 564, 568 (7th Cir.1988); *United States v. Payton*, 878 F.2d 1089, 1092 (8th Cir.1989), *judg. vacated on other grounds*, 496 U.S. 901, 110 S.Ct. 2581, 110 L.Ed.2d 262 (1990), *aff'd*, 918 F.2d 54 (8th Cir. 1990).

4. A different theory under which immunity might be granted in rare instances for due process reasons is the "prosecutorial misconduct" theory. It "holds that a court has the power to order

the government to grant statutory immunity to a witness (or face a judgment of acquittal) where there exists prosecutorial misconduct arising from the government's deliberate intent to distort the fact-finding [sic] process." *United States v. Angiulo*, 897 F.2d at 1190. *See, e.g., United States v. Pinto*, 850 F.2d 927, 935 (2d Cir.), *cert. denied sub nom. Vence v. United States*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *United States v. Morrison*, 535 F.2d 223, 229 (3d Cir.1976); *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir.1988); *United States v. Lord*, 711 F.2d 887, 891 (9th Cir.1983).

The majority of federal appellate courts will not interfere with the Government's refusal to grant immunity unless there has been a clear abuse of that power. *See generally United States v. Lugg*, 892 F.2d at 104; *United States v. Angiulo*, 897 F.2d at 1193; *United States v. Pennell*, 737 F.2d at 528; *United States v. Taylor*, 728 F.2d at 934; *United States v. Hart*, 546 F.2d 798 (9th Cir.1976)(en banc), *cert. denied sub nom. Robles v. United States*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 571 (1977).

government agent. However, the question involves appellant's predisposition. Presumably, B would have testified that he approached appellant approximately ten times, and each time appellant refused to go to Elizabethtown to buy crack cocaine. B would also have testified that he had neither seen appellant distribute drugs nor heard of him distributing drugs to anyone prior to January 6, 1992.

24. However, there is ample evidence to defeat any claim by appellant that he was merely a law-abiding citizen. This provides a number of factors which negate the defense of entrapment. First, appellant's name was already known to CID; second, appellant's reluctance stems from the fact that he thought B was working for CID; third, appellant had tested positive for wrongful use; fourth, there was no fraud or trickery by the Government; fifth, appellant admitted that he knew where to buy drugs and admitted smoking crack cocaine in front of various witnesses; and, sixth, appellant demonstrated "the initiative and the know-how" (¶ 10) to purchase illicit drugs.

25. Appellant's criminal disposition was also evidenced by his activities after January 6, 1992. It was not long after Clay gave appellant his beeper number that appellant paged him and asked if he had any additional cocaine appellant could distribute to his friends. Several weeks later when Clay contacted appellant about purchasing more cocaine, appellant asserted that his services would require a cocaine payment. This transfer was consummated at appellant's quarters. Appellant certainly is not an "unwary innocent."

26. Additionally, the judge had no facts before him that the prosecution was acting in bad faith. *See United States v. Taylor,* 728 F.2d 930, 935 (7th Cir.1984). The Government had legitimate reasons to refuse to grant use immunity to B given that his recent conviction was being appealed. For these reasons, we hold that the military judge did not abuse his discretion in refusing to abate the proceedings until B was granted use immunity.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

WISS, Judge (concurring in part and in the result):

27. I am not entirely certain whether the majority opinion distinguishes between or views as identical the notions of judicially ordered immunity, on the one hand, and judicial abatement of proceedings in the face of executive refusal to grant immunity, on the other. This case involves only the latter, and I fully agree with the majority's rationale and disposition of that issue under the circumstances of this prosecution. Any discussion of the legitimacy or illegitimacy of the former, however, is not in issue and is dicta, so I decline to join in it.